CATERPILLAR, INC., an Illinois corporation, )
and CATERPILLAR MEXICO, S.A., a foreign )
corporation, )
           )
             **Plaintiffs,** )
           )
               **v.** )     **No. 04 C 2474**
           )
USINOR INDUSTEEL, a foreign corporation, )     **Judge Rebecca R. Pallmeyer**
USINOR INDUSTEEL (USA), INC., a )
Pennsylvania corporation, and LEECO STEEL )
PRODUCTS, INC., an Illinois corporation, )
           )
             **Defendants.** )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Caterpillar, Inc. ("Caterpillar") and Caterpillar Mexico, S.A. ("CMSA") filed this action against three defendants: Usinor Industeel ("Usinor"), a French steel manufacturer; Usinor Industeel (USA), Inc. ("Usinor USA"), Usinor's U.S. subsidiary; and Leeco Steel Products, Inc. ("Leeco"), Usinor's North American distributor. At issue is a transaction involving a specialized type of steel called Creusabro 8000 that Usinor manufactured and sold to CMSA through Leeco. CMSA used the steel to fabricate heavy-duty dump truck bodies for Caterpillar which, in turn, sold the trucks to its customers for use in mining operations. Caterpillar alleges that most of the truck beds made with Creusabro 8000 cracked and became unusable, forcing Caterpillar to replace the trucks at great cost to itself and its reputation.

In their eleven-count Complaint, Plaintiffs assert individual claims against each Defendant. Specifically, Plaintiffs charge Usinor with breach of express and implied warranties and failure to deliver conforming goods in violation of the United Nations Convention on Contracts for the International Sale of Goods, *opened for signature* Apr. 11, 1980, S. TREATY DOC. NO. 98-9 (1983),

19 I.L.M. 668, *reprinted in* 15 U.S.C.A. app. at 332 (West 1998) (hereinafter the "CISG"),[1] and the Illinois version of the Uniform Commercial Code ("UCC"), 810 ILCS 5/2-313, 5/2-315 (Counts II and V); promissory estoppel (Counts III and VIII); and violation of French law (Count XI). Plaintiffs charge Usinor USA with promissory estoppel (Counts IV and X) and breach of express and implied warranties in violation of the UCC (Count VII). Finally, Plaintiffs charge Leeco with breach of express and implied warranties and failure to deliver conforming goods in violation of the CISG and the UCC (Counts I and VI), and promissory estoppel (Count IX).

Usinor and Usinor USA together move to dismiss all eight counts asserted against them (Counts II-V, VII, VIII, X, and XI) pursuant to FED. R. CIV. P. 12(b)(6). Usinor and Usinor USA alternatively move for a more definite statement as to Count XI (the French law claim) under FED. R. CIV. P. 12(e). Leeco moves separately to dismiss Count VI only, pursuant to the Illinois "Distributor Statute," 735 ILCS 5/2-621. For the following reasons, Defendants' motions are granted in part and denied in part.

## FACTUAL BACKGROUND[2]

### A.    The Parties

Plaintiff Caterpillar is an Illinois corporation with its principal place of business in Peoria, Illinois. (Compl. ¶ 5.) Caterpillar specializes in the manufacture and distribution of heavy equipment, including heavy-duty dump trucks used in mining operations. (*Id.* ¶ 12.) Caterpillar maintains a plant in Decatur, Illinois, which specializes in manufacturing such trucks. (*Id.* ¶ 15.) Plaintiffs assert that Caterpillar is well known for its high-quality dump trucks and derives significant competitive advantage from this reputation in the industry. (*Id.* ¶ 1.)

---

[1]      The text of the treaty is available on Westlaw at 19 I.L.M. 668, or on Lexis as USCS Int'l Sale of Goods.

[2]      The facts are drawn from Plaintiffs' Complaint, cited here as "Compl. ¶ __."

Plaintiff CMSA, a Mexican corporation with its principal place of business in Monterrey, Mexico, is a subsidiary of Caterpillar. (Id. ¶¶ 2, 6.) CMSA manufactures truck bodies for Caterpillar at its facilities in Mexico. (Id. ¶ 2.) Plaintiffs assert that CMSA was experienced at manufacturing truck bodies for Caterpillar and had a proven track record of producing high-quality truck bodies. (Id.)

Defendant Usinor, a steel manufacturer, is a French corporation with its principal place of business in Cedex, France.[3] (Id. ¶¶ 1, 7, 13.) Defendant Usinor USA is a Delaware corporation with its principal place of business in Pennsylvania. (Id. ¶ 8.) Plaintiffs assert that Usinor USA was a wholly owned subsidiary and alter ego of Usinor, and that Usinor USA acted as Usinor's actual agent, at all times relevant to this dispute. (Id.)

Defendant Leeco is an Illinois corporation with its principal place of business in Darien, Illinois. Plaintiffs assert that Leeco is Usinor's exclusive North American distributor, and that Leeco was Usinor's agent at all times relevant to this dispute. (Id. ¶¶ 9, 15.)

**B. Creusabro 8000 Steel**

In 1998, Usinor and Usinor USA (collectively "the Usinor Defendants") requested a meeting with Caterpillar to present what Caterpillar characterizes as a "sales pitch" for a new type of steel called Creusabro 8000 ("Creusabro"). (Id. ¶ 13.) At a meeting on April 20, 1998 in Decatur, Illinois, and at a similar meeting in Joliet, Illinois,[4] the Usinor Defendants claimed that Creusabro was the "next generation" of steel because it was harder, had a higher yield strength, had better welding characteristics, and could be processed more inexpensively than regular steel. (Id.) Specifically,

---

[3]     Plaintiffs plead on information and belief that Usinor now operates as Arcelor. (Compl. ¶ 7.) Usinor's memorandum in support of its motion to dismiss states that Usinor changed its name in July 2002 and spun off several divisions into new companies, and that Usinor USA recently underwent similar changes. (Usinor Industeel and Usinor Industeel (U.S.A.), Inc.'s Memorandum in Support of Their Motion to Dismiss ("Usinor Mem."), at 1 n.2). The court will use the names listed in Plaintiff's complaint—Usinor and Usinor USA—for purposes of this decision.

[4]     The Complaint does not specify the date of the Joliet meeting.

the Usinor Defendants told Caterpillar that Creusabro steel did not require preheating for welded joints which were less than 50 mm, or two inches, thick. (*Id.*) This was a significant improvement over the steel Caterpillar was then using, which required preheating for joints thicker than 40 mm. (*Id.*) The Usinor Defendants also claimed that any of four industry-accepted welding processes would work with Creusabro. (*Id.* ¶ 31.)

Upon Caterpillar's request following the April 1998 meeting, the Usinor Defendants provided samples of Creusabro, which Caterpillar then tested and determined would perform as the Usinor Defendants had claimed. (*Id.* ¶ 14.) Plaintiffs assert that the Usinor Defendants promised that the sample was representative of steel they could provide on a high volume basis and that all Creusabro would perform as well as the sample. (*Id.*)

In the spring of 2000, representatives of the Usinor Defendants met with Caterpillar at Caterpillar's dump-truck plant in Decatur, Illinois. (*Id.* ¶ 15.) This time, representatives from Leeco, the Usinor Defendants' exclusive North American distributor, attended as well. (*Id.*) All Defendants made another presentation about the benefits of Creusabro and promised, both orally and in writing, that Creusabro could be welded without preheating in thicknesses up to 50 mm.[5] (*Id.*) Caterpillar informed Defendants that it intended to use Creusabro for truck bodies, and gave the Usinor Defendants and Leeco design specifications for the truck bodies that would be manufactured using Creusabro steel. (*Id.*)

Caterpillar submitted proposals to its dump truck customers for lighter weight truck bodies that would result from using Creusabro steel. (*Id.* ¶ 17.) While it planned ultimately to sell the truck bodies, Caterpillar did not plan to manufacture all the truck bodies itself. (*Id.*) Some would be fabricated by CMSA, its Mexican subsidiary, and some by Western Technology Services

---

[5]     The Complaint does not provide any details regarding the written representations that Creusabro could be welded without preheating.

4

International, Inc. ("Westech"), a Wyoming company unrelated to Caterpillar.[6]   (*Id.* ¶¶ 2, 17.) Representatives of Leeco and of the Usinor Defendants inspected CMSA's plant in Mexico and assured CMSA that its facilities were appropriate for fabricating truck bodies with Creusabro. (*Id.* ¶ 18.)  Having previously visited Westech's plant as well in May 1999, Leeco and the Usinor Defendants informed Caterpillar that the facilities and processes in place at both CMSA and Westech were appropriate for fabricating truck bodies with Creusabro.[7]  (*Id.* ¶ 19.)

After entering into contracts with its customers to sell the lighter weight truck bodies, Caterpillar issued purchase orders to CMSA and Westech for completed truck bodies.  CMSA and Westech then issued purchase orders to Leeco for Creusabro steel to be used in fabricating the truck bodies.  (*Id.* ¶¶ 20, 21.)  Plaintiffs assert that the Usinor Defendants instructed CMSA and Westech to buy the Creusabro from Leeco. (*Id.* ¶ 20.)

## C.    Problems with the Creusabro Steel

CMSA and Westech received their first shipments of Creusabro in 2000.[8]  (Compl. ¶ 21.) Using steel from the first shipment of Creusabro, Westech fabricated eight truck bodies and delivered them to the Bald Mountain mine in Nevada in June 2000.  No problems were reported

---

[6]       Westech is not a party to this litigation.  It is not clear from the Complaint whether Caterpillar manufactured or planned to manufacture any of the truck bodies itself.  Plaintiffs make no such assertion, but the Complaint states that only "some of the truck bodies would be made by CMSA and Westech." (Compl. ¶ 17.)  The Complaint does not identify any other manufacturer, and Caterpillar's Decatur, Illinois facility "specialized" in making the dump trucks.  (*Id.* ¶ 15.)  In any event, at this stage of the proceedings, the court considers only the allegations on the face of the Complaint, which concern the Creusabro that was used in truck bodies manufactured by CMSA and Westech.

[7]       Plaintiffs do not identify the Defendants' representatives who visited either CMSA or Westech.

[8]       The Complaint does not specify when the shipments occurred, when Caterpillar issued the purchase orders to CMSA and Westech, or when CMSA and Westech issued the purchase orders to Leeco.  Given Plaintiffs' assertion that Defendants made their final sales presentation in the spring of 2000 (Compl. ¶ 15), and that Westech delivered the first completed truck bodies using Creusabro in June 2000 (*id.* ¶ 21), however, it is reasonable to infer that the purchase orders were issued, and the steel delivered, sometime between March and June 2000.

with these trucks. (*Id.*) Beginning with the next shipment of Creusabro steel, however, Plaintiffs assert that "serious problems with the steel began to occur." (*Id.* ¶ 22.) Seven truck bodies manufactured by Westech for delivery to the Centralia Mine in Washington in June and July 2000 displayed "hydrogen-induced cracking" in their floors during manufacture and along the side walls once in use. (*Id.*) In July 2000, four more Westech-made trucks had to be taken out of service from the Chino Mine in New Mexico due to cracks throughout their bodies. (*Id.* ¶ 23.) The customer[9] at the Chino Mine demanded that Caterpillar provide replacement truck bodies using a different kind of steel; Caterpillar did so. (*Id.*) In September 2000, a Westech-made truck body delivered to Tyrone Mine in New Mexico also displayed cracking, forcing Westech to add horizontal and vertical ribs to reduce flexing and cracking. (*Id.*)

Truck bodies manufactured by CMSA fared no better. When CMSA delivered nineteen truck bodies to Bagdad Mine in Arizona, hydrogen-induced cracking was present where the shipping brackets were placed, even though CMSA had implemented additional processing measures during fabrication, including preheating throughout the welding process. (*Id.* ¶ 26.) Hydrogen-induced cracking was so severe in the beds of seven CMSA-made truck bodies delivered to the Syncrude Mine in Alberta, Canada beginning in October 2000 that none of the truck bodies was assembled or put in service; all seven truck beds were scrapped. (*Id.* ¶ 27.)

Three truck bodies delivered to Bingham Canyon Mine in Utah between August 2000 and March 2001 showed hydrogen-induced cracking in hundreds of places, and one could not even be assembled at the mine. Of the three, Westech made one and CMSA made the other two. (*Id.* ¶ 24.) Plaintiffs assert that additional truck bodies delivered to other customers had similar problems, and that hydrogen-induced cracking rendered inoperable the vast majority of truck bodies that Caterpillar sent to its customers. (*Id.* ¶ 28.)

---

[9]      The Complaint does not identify the particular customer.

In addition to the cracking, Plaintiffs allege that much of the Creusabro steel provided to CMSA was of low quality, with surface slag left over from the manufacturing process, grind marks, and gouges. These problems made the steel harder to work with and "dramatically" increased costs. (*Id.* ¶ 29.) Plaintiffs further assert that chemical analysis of Creusabro from CMSA and Westech confirmed that the steel "failed to comply with the chemical specifications that had originally been provided,"[10] and that the steel in no way resembled the quality of the sample that the Usinor Defendants had provided to Caterpillar. (*Id.* ¶ 33.)

### D. Defendants' Responses

In response to these difficulties with the Creusabro steel, Caterpillar, CMSA, and Westech contacted Leeco and the Usinor Defendants. In addition to "many telephone calls and e-mails," meetings took place in Wyoming, Mexico, and Illinois to discuss the problems. (*Id.* ¶ 30.) Plaintiffs assert that during these discussions, the Usinor Defendants modified their suggested procedures for welding the Creusabro steel. (*Id.* ¶ 31.) In November 2000, the Usinor Defendants suggested preheating the steel to 212 degrees Fahrenheit for all crack repairs, and using only a welding process known as "GMAW." (*Id.*) Plaintiffs assert that these suggestions were contrary to the Usinor Defendants' earlier assurances that no preheating was necessary, and that four different welding processes could be used. (*Id.*)

In January 2001, after Caterpillar and CMSA notified Leeco and the Usinor Defendants of continued problems with hydrogen-induced cracking, the Usinor Defendants suggested preheating all welds to 300 degrees, "permitting a soak time to three inches,"[11] and grinding and cleaning all metal parts. (*Id.* ¶ 32.) Plaintiffs allege that all of these suggestions were being presented for the

---

[10]     Plaintiffs do not identify who provided the original specifications of the steel, nor the form of those specifications.

[11]          The Complaint does not describe or explain the significance of "permitting a soak time to three inches."

7

first time, and that all increased the costs of working with the steel.[12] (*Id.*) After further review and testing, Caterpillar determined that Creusabro steel could not be welded without preheating, and that in light of the specifications for truck bodies that it had provided to the Usinor Defendants and to Leeco, the steel was not fit for use in manufacturing truck beds. (*d.*)

Caterpillar asserts that it was forced to repair all the cracked truck bodies pursuant to warranty, at a cost of over $1.8 million, and that it suffered injury to its reputation. (*Id.* ¶ 34.) CMSA alleges that it incurred over $1 million in extra costs for processing the steel, resulting in a net loss of over $1 million. (*Id.*) Defendants rejected Plaintiffs' attempts to return their excess inventory of Creusabro steel, which Plaintiffs sold for scrap in an effort to mitigate damages. (*Id.* ¶ 35.) Plaintiffs seek damages in an amount to be proven at trial. (*See, e.g., id.* ¶¶ 41, 66.)

### E. Plaintiffs' Lawsuit

On April 6, 2004, Caterpillar and CMSA filed an eleven-count Complaint against Leeco, Usinor USA, and Usinor. Both Plaintiffs claim that Defendants are liable to them under theories of breach of express and implied warranties (Counts I, II, V-VII), failure to deliver conforming goods (Counts I and II), and promissory estoppel (Counts III, IV, VIII-X). Plaintiffs bring these claims under both Illinois law and the CISG. Plaintiffs also assert an additional claim against Usinor under French law (Count XI).

Of the eleven counts in the Complaint, CMSA brings four (Counts I-IV), Caterpillar brings six (Counts V-X), and CMSA and Caterpillar jointly assert the French law claim (Count XI). Plaintiffs base their claims against Usinor on the theory that Leeco and Usinor USA were Usinor's agents. (Compl. ¶¶ 8, 9.) Accordingly, with the exception of Count I, Plaintiffs' claims against Leeco and Usinor USA (Counts IV, VI, VII, IX, and X) are alleged only in the alternative, in the event the court

---

[12]    The Complaint does not reveal whether Caterpillar implemented any of Defendants' suggestions from either November 2000 or January 2001.

finds that either Leeco or Usinor USA was not Usinor's agent. Plaintiffs assert Count I against Leeco directly.

On July 28, 2004, the Usinor Defendants filed a motion to dismiss all eight counts against them under FED. R. CIV. P. 12(b)(6). (Usinor Industeel and Usinor Industeel (USA), Inc.'s Motion to Dismiss ("Usinor Motion") ¶ 3.) The Usinor Defendants argue that Leeco and Usinor USA were not Usinor's agents, and that any claims that rely on these agency relationships should be dismissed. (Usinor Mem., at 11-12.) The Usinor Defendants further contend that all of Plaintiffs' state law claims are preempted by the CISG. (*Id.* at 6-8.) Even absent preemption, the Usinor Defendants argue, Caterpillar's state law claims for breach of warranty fail for lack of privity or reliance (*id.* at 9-10), and the promissory estoppel claims fail to allege the necessary elements (*id.* at 12-13) and are barred by the statute of frauds in any event. (*Id.* at 13-14.) Finally, the Usinor Defendants argue that in Count XI, Plaintiffs fail to state a claim under the terms of Article 1109 of the French Civil Code. (*Id.* at 14-15). Alternatively, Defendants move for a more definite statement as to Count XI under FED. R. CIV. P. 12(e).[13] (Usinor Motion ¶ 4.)

Also on July 28, 2004, Leeco filed a motion to dismiss Count VI pursuant to the Illinois "Distributor Statute," 735 ILCS 5/2-621.[14] (Leeco Motion, at 2.) Leeco argues that it cannot be held liable as a non-manufacturing defendant, and that Caterpillar's allegations are "conclusory." (*Id.* at 2, 4.) Leeco has not moved to dismiss Counts I or IX.

---

[13]     The Usinor Defendants' motion included an argument for dismissal based on lack of personal jurisdiction that was later withdrawn. (Response of Plaintiffs Caterpillar Inc. and Caterpillar Mexico, S.A. to Usinor Industeel and Usinor Industeel (USA), Inc.'s Motion to Dismiss (hereinafter "Pl. Resp."), at 1 n.1.)

[14]     Leeco's motion to dismiss refers to "Count IV," not Count VI. (Leeco's Motion to Dismiss Count IV in Lieu of Answer (hereinafter "Leeco Motion.") Leeco clarified at a status hearing, however, that the motion applies to Count VI. (Response of Plaintiffs Caterpillar Inc. and Caterpillar Mexico, S.A. to Leeco Steel Products Inc.'s Motion to Dismiss, at 2 n.1.)

## I.    Standard of Review

On a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiffs. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423,1429 (7th Cir. 1996). The court must accept a pleading's factual allegations because "a motion to dismiss tests the legal sufficiency of a pleading." *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 675 (7th Cir. 2001). Dismissal under Rule 12(b)(6) is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lee v. City of Chicago,* 330 F.3d 456, 459 (7th Cir. 2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

## II.    French Law Claim (Count XI)

As noted, Plaintiffs bring their claims under the CISG, Illinois law, and French law. Plaintiffs assert Count XI, the French law claim, only in the alternative in the event the court determines that any of their claims against Usinor are governed by French law. (Compl. ¶ 102.) Plaintiffs assert claims under French Civil Code, Article 1109, for breach of contract, breach of express and implied warranties, failure to provide goods that conformed to the sample provided, breaches of the express promises made regarding Creusabro steel, and error on the very substance of the goods. (*Id.*) Because the court finds that French law does not apply in this case, the court dismisses Count XI without prejudice.

A federal district court with jurisdiction over a state law claim applies the choice of law rules of the state in which it sits. *Curran v. Kwon,* 153 F.3d 481, 488 (7th Cir. 1998) (applying Illinois choice of law rules in a diversity case); *U.S., for Use and Benefit of Lichter v. Henke Const. Co.,* 157 F.2d 13, 24 (8th Cir. 1946) (extending the principle to federal question cases); *Cromer Finance Ltd. v. Berger,* 137 F. Supp. 2d 452, 491-492 (S.D.N.Y. 2001) (applying New York choice of law

rules to supplemental state law claims in a federal question case). Under Illinois law, choice of law in contract-based claims involves selecting the jurisdiction with the most significant contacts with the transaction and the parties. *Curran,* 153 F.3d at 488 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971)). The court considers factors such as the place of contracting, the place of the negotiation, the place of performance, the location of the subject matter of the contract and the domicile and nationality of the parties, according to these factors' relative importance with respect to the particular issue at stake in the litigation. *Id.*

Applying Illinois choice of law rules, it is clear that none of Plaintiffs' claims are governed by French law. The only connection with France is that Usinor has its principal place of business there. (Compl. ¶ 7.) Leeco and the Usinor Defendants met with Caterpillar in Illinois to make their sales presentations in 1998 and 2000, and met with CMSA in Mexico to evaluate the manufacturing facilities. (*Id.* ¶¶ 13, 15, 18.) Defendants shipped Creusabro steel to Mexico and Wyoming for use in the truck bodies, which in turn were delivered to mines throughout North America. (*Id.* ¶¶ 21-27.) The complaint is devoid of any allegations that negotiation or performance of the contract took place anywhere but Illinois, Wyoming, or Mexico. In fact, the bulk of the contracting activity occurred in Illinois. Accordingly, Illinois law, not French law, applies to Plaintiffs' state law claims. The court thus grants the Usinor Defendants' motion to dismiss Count XI, without prejudice, and denies Defendants' alternative Rule 12(e) motion for a more definite statement.

## III. Agency Allegations

Plaintiffs assert that Leeco and Usinor USA were agents of Usinor. (Compl. ¶¶ 8, 9.) They thus bring Counts IV, VI, VII, IX, and X only in the alternative, in the event the court finds that either Leeco or Usinor USA was not Usinor's agent. The Usinor Defendants argue that any claims that rely on agency should be dismissed because Plaintiffs have not adequately established any agency relationships. (Usinor Mem., at 11-12.) Accordingly, the court first examines whether Plaintiffs have sufficiently pleaded an agency relationship between Usinor and either Leeco or Usinor USA.

11

Under Illinois law,[15] the test for agency is whether the alleged principal has the right to control the manner in which work is carried out by the alleged agent, and whether the alleged agent can affect the legal relationships of the principal. *Chemtool, Inc. v. Lubrication Technologies, Inc.,* 148 F.3d 742, 744 (7th Cir. 1998). Agency can arise when an agent has either "actual" or "apparent" authority to act on the principal's behalf. *Opp v. Wheaton Van Lines, Inc.,* 231 F.3d 1060, 1064 (7th Cir. 2000). The agent has actual authority when the principal's words or actions would lead a reasonable person in the agent's position to believe that he or she was so authorized. *Id.* An agent has apparent authority to act on the principal's behalf in relation to a third party when the words or conduct of the principal would lead a reasonable person in the third party's position to believe that the principal had so authorized the agent. *Id.* at 1065; RESTATEMENT (SECOND) OF AGENCY § 27. Where an agent with such authority contracts with a third party on behalf of a disclosed principal, the agent does not become a party to the contract and is not liable upon it. RESTATEMENT (SECOND) OF AGENCY § 320; *see Joe & Dan Int'l Corp. v. U.S. Fidelity & Guar. Co.,* 178 Ill. App. 3d 741, 747, 533 N.E.2d 912, 915 (1st Dist. 1988) ("[I]t is obvious that an agent cannot be liable to a third party with whom he has contracted on his principal's behalf" where the agent had apparent authority). The principal, not the agent, is liable in such a situation. *See* RESTATEMENT (SECOND) OF AGENCY § 144.

The Usinor Defendants argue that Plaintiffs have failed to allege sufficient facts to show that either Leeco or Usinor USA was under control of Usinor or could subject Usinor to liability. (Usinor Mem., at 12.) Citing *Rand Bond of N. Am., Inc. v. Saul Stone & Co.,* 726 F. Supp. 684, 687 (N.D. Ill. 1989), and several other federal district court cases, Defendants contend that Plaintiffs are required to plead facts which would establish agency. (*Id.*) In the court's view, this argument blurs

---

[15]     Both Illinois and federal common law follow the RESTATEMENT (SECOND) OF AGENCY § 1 *et seq.* (1971). *See Opp v. Wheaton Van Lines, Inc.,* 231 F.3d 1060, 1064 (7th Cir. 2000) (noting the accord of both Illinois and federal common law with the Restatement). Thus, the test for agency would be the same under the CISG.

the distinction between the pleading standards in Illinois and federal courts. While state law provides the substantive law for state law claims brought in federal court, federal law establishes the pleading standard. *Guaranty Residential Lending, Inc. v. International Mortgage Ctr., Inc.*, 305 F. Supp. 2d 846, 851 (N.D. Ill. 2004) (citing *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 925-26 (7th Cir. 2003)). Federal courts require only notice pleading. *Id.* Under FED. R. CIV. P. 8(a), this pleading standard is satisfied by "a short and plain statement of the claim" that gives the defendant fair notice of what the claim is and the grounds upon which it rests. *See Conley*, 355 U.S. at 47.

The cases cited by the Usinor Defendants fail to support their argument that Plaintiffs are required to plead specific facts establishing agency. First, all of Defendants' cases pre-date the Supreme Court's decision in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002), where the Court, holding that there is no heightened pleading standard in employment discrimination cases, reiterated that "Rule 8(a)'s simplified pleading standard applies to all civil actions," with only limited exceptions not applicable in this case. Second, most of Defendants' cases themselves rely on Illinois cases in which fact-pleading was required. For example, in *Maietta v. Ford Motor Co.*, No. 96 C 8347, 1997 WL 162894, at *4 (N.D. Ill. Mar. 27, 1997), the court relied heavily on *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 498, 675 N.E.2d 584, 592 (1996), in reaching the conclusion that the plaintiff had failed to plead more than the legal conclusion of agency. *Kowalke v. Bernard Chevrolet, Inc.*, No. 99 C 7980, 2000 WL 656660, at *3 (N.D. Ill. Mar. 23, 2000), in turn, quotes both *Maietta* and *Connick*, while *Peterson v. H&R Block Tax Servs., Inc.*, 971 F. Supp. 1204, 1213 (N.D. Ill. 1997), cites to *Knapp v. Hill*, 276 Ill. App. 3d 376, 382, 657 N.E.2d 1068, 1071 (1st Dist. 1995).

Defendants' use of these cases is misleading. A plaintiff alleging agency in Illinois state court may have to set forth specific facts, but in federal court, "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley*, 355 U.S. at 47. The existence of agency is a question of fact, *see Brunswick Leasing Corp. v.*

13

*Wisconsin Central, Ltd.*, 136 F.3d 521, 526 (7th Cir. 1998), so it would be improper for a court to dismiss a claim on the basis of an insufficient factual allegation of agency, without giving the plaintiff a chance to prove the existence of the agency relationship. *See Grode v. Lakeside Furniture Co.*, No. 82 C 5752, 1985 WL 2486, at *2 (N.D. Ill. Sept. 6, 1985). A federal court should not dismiss a claim for the plaintiff's failure to plead facts; rather, the claim should be dismissed only if it "appears beyond doubt that the plaintiff can prove *no* set of facts in support of his claim." *Conley*, 355 U.S. at 45-46 (emphasis added).

Moreover, the cases cited by the Usinor Defendants involved plaintiffs who had failed to plead *any* facts at all regarding agency. *See Abraham v. North Ave. Auto, Inc.*, No. 00 C 1764, 2001 WL 1002067, at *4 (N.D. Ill. Aug. 24, 2001) (plaintiff alleged no facts at all from which the court could infer that the alleged agent had acted on actual or apparent authority); *see also Peterson*, 971 F. Supp. at 1213 (plaintiff alleged nothing to show that the alleged agent was instructed by the principal); *Rand*, 726 F. Supp. at 687 (plaintiff's complaint asserted only the "naked conclusion" of agency without showing "even the bare bones of an agency relationship"). Here, in contrast, Plaintiffs have pleaded several facts from which the court can infer at least the apparent authority of Leeco and Usinor USA to act on Usinor's behalf.

An agent's apparent authority is determined in light of the principal's conduct towards a third party; the principal must do something to lead the third party to believe that the agent is authorized to act on the principal's behalf. *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 859-60 (7th Cir. 2001). In other words, there must be "some form of communication, direct or indirect," by which the principal instills such a reasonable belief in the mind of the third party. *Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1336 (7th Cir. 1995). Plaintiffs here have asserted that Usinor and Usinor USA instructed CMSA and Westech to buy the Creusabro from Leeco. (Compl. ¶ 20.) This fact alone is sufficient, at this stage of the proceedings, to establish that Leeco was an apparent agent of Usinor and of Usinor USA. *See Williams v. Ford Motor Co.*, 990 F. Supp. 551, 555-56

14

(N.D. III. 1997) (for purposes of a motion to dismiss, allegation that Ford instructed a car owner to take his car to an authorized Ford dealer for extended warranty service was sufficient to establish that the dealer was Ford's apparent agent).

The Usinor Defendants argue that Leeco cannot be an agent because it was merely a distributor, and a distributor is not considered an agent of a manufacturer as a matter of law. (Defendants Usinor Industeel's and Usinor Industeel (USA), Inc.'s Reply Memorandum in Support of Their Motion to Dismiss (hereinafter "Usinor Reply"), at 5.) Defendants are only partially correct. It is true that Leeco's status as Usinor's distributor does not, in itself, make Leeco an agent of Usinor. *See Asante Techs., Inc. v. PMC-Sierra, Inc.*, 164 F. Supp. 2d 1142, 1148 (N.D. Cal. 2001) ("[A] distributor of goods for resale is normally not treated as an agent of the manufacturer."); *see also* RESTATEMENT (SECOND) OF AGENCY § 14J ("One who receives goods from another for resale to a third person is not thereby the other's agent in the transaction.") Plaintiffs, however, have not based their assertion that Leeco was Usinor's agent merely on the fact that Leeco was Usinor's distributor; as noted above, Plaintiffs also allege that Usinor instructed CMSA to buy the steel from Leeco. Furthermore, Plaintiffs have alleged more activity on Leeco's part than simply buying steel from Usinor and re-selling it to CMSA and Westech. Leeco joined Usinor and Usinor USA in their sales presentation to Caterpillar in Illinois in 2000, (Compl. ¶ 15), and in their visits to Westech and CMSA to evaluate the manufacturing facilities. (*Id.* ¶¶ 18-19.) Thus, especially in light of the low threshold of federal notice-pleading, Plaintiffs have sufficiently alleged that Leeco was the agent of both Usinor and Usinor USA.[16]

---

[16]     *Asante Technologies*, cited by Defendants, is distinguishable. There, the buyer's contract with the distributor stated that the contract did not allow the distributor to create or assume any obligation on behalf of the manufacturer. 164 F. Supp. 2d at 1148 -1149. No such disclaimer appears here. Furthermore, in *Asante Technologies*, the distributor was not even mentioned in the complaint. *Id.* at 1149.

Plaintiffs' allegations of agency regarding Usinor USA are also sufficient. Plaintiffs have asserted that Usinor and Usinor USA together requested and attended both the 1998 and the 2000 sales presentations in Illinois (Compl. ¶¶ 13, 15); together provided the samples of Creusabro (*id.* ¶ 14); together visited Westech and CMSA (*id.* ¶¶ 18, 19); together made the alleged promises and representations regarding the steel (*id.* ¶¶ 13, 14 ); and together were involved in discussions with Plaintiffs after problems emerged with Creusabro. (*Id.* ¶¶ 30-32). Plaintiffs also allege, on information and belief, that Usinor USA was a wholly owned subsidiary and "alter ego" of Usinor. (*Id.* ¶ 8.) In light of these assertions, Plaintiffs would be entitled to a reasonable belief that Usinor USA was under the control of Usinor. Under the federal notice-pleading standard, this is sufficient to establish that Usinor USA was Usinor's agent for purposes of a motion to dismiss. *See Guaranty Residential Lending*, 305 F. Supp. 2d at 862 (under federal pleading rules, nothing more was required beyond a conclusory allegation that alleged agent had apparent authority).

In light of the court's determination that Plaintiffs have adequately alleged an agency relationship between Usinor and Leeco and Usinor USA, Counts IV, VI, VII, IX, and X, which Plaintiffs asserted as alternative claims in the event the court found that agency was lacking, are dismissed without prejudice. Plaintiffs may seek to have these claims reinstated should the evidence later reveal that either Leeco or Usinor USA was not in fact Usinor's agent. Despite this conclusion, the court nevertheless will give further consideration below to Leeco's arguments in support of its motion to dismiss Count VI.

Of the remaining claims (Counts I, II, III, V, and VIII), all are asserted against Usinor save Count I, which is a CISG claim asserted by CMSA against Leeco. (Compl. ¶¶ 36-41.) The court will not dismiss Count I at this time because Leeco has not moved to dismiss it, and because unlike the other claims against Leeco, it was not brought as an alternative claim. The court will continue with its analysis of Counts II, III, V, and VIII.

## IV. Preemption by the CISG

The Usinor Defendants argue that Plaintiffs' state law UCC and promissory estoppel claims are preempted by the CISG. (Usinor Mem., at 6-8.) The CISG is an international treaty, ratified by the United States in 1986, that "sets out substantive provisions of law to govern the formation of international sales contracts and the rights and obligations of the buyer and seller." *Usinor Industeel v. Leeco Steel Products, Inc.,* 209 F. Supp. 2d 880, 884 (N.D. Ill. 2002) (quoting 15 U.S.C. App. at 52 (1997)). The CISG applies to international sales contracts between parties that are located in signatory countries, and who have not opted out of CISG coverage at the time of contracting. *Id.; see Delchi Carrier SpA v. Rotorex Corp.,* 71 F.3d 1024, 1028 (2d Cir. 1995) (CISG is self-executing and applies where the agreement is silent as to choice of governing law); *see generally* Elizabeth D. Lauzon, Annotation, *Construction and Application of United Nations Convention on Contracts for the International Sale Of Goods (CISG)* 200 A.L.R. FED. 541 (2005) (hereinafter Lauzon, Annotation) (collecting cases interpreting the CISG).

As a treaty to which the United States is a signatory, the CISG is federal law; thus, under the Supremacy Clause, it preempts inconsistent provisions of Illinois law where it applies. *Usinor Industeel,* 209 F. Supp. 2d at 884-85 (citing U.S. CONST., art VI, cl. 2). The issue is one of scope. State law causes of action that fall within the scope of federal law are preempted. *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 66 (1987) (holding that ERISA preempts state causes of action within the scope of § 502(a) of ERISA). Conversely, state law causes of action that fall outside the scope of federal law will not be preempted. *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for Southern California,* 463 U.S. 1, 23 (1983) (holding that ERISA did not preempt a state law cause of action outside the scope of § 502(a)). Thus, the CISG preempts Plaintiffs' UCC and promissory estoppel claims only if such claims fall within the scope of the CISG. *Cf. Asante Techs.,* 164 F. Supp. 2d at 1152 (holding that the CISG preempted a state law contract claim because it fell within the scope of the CISG).

17

The Usinor Defendants interpret the CISG as having a "broad scope." (Usinor Mem., at 7.) Defendants argue that the purpose of the CISG is the adoption of uniform rules to govern international contracts, and that the application of state law here would frustrate that purpose. (*Id.* at 7-8.) Plaintiffs argue that the CISG applies only to claims between a buyer and a seller. (Pl. Resp., at 4-5.) Thus, Plaintiffs argue, the CISG applies to, and can preempt, only those claims involving CMSA as the buyer of the steel, and not any claims brought by Caterpillar. *Id.* at 4-7.)

Case law interpreting the preemptive effect of the CISG is sparse. *Usinor Industeel*, 209 F. Supp. 2d at 884 (noting the dearth of federal cases interpreting the CISG). Under general principles of preemption, however, courts must be reluctant in finding federal preemption of a subject "traditionally governed by state law." *Time Warner Cable v. Doyle*, 66 F.3d 867, 874-75 (7th Cir. 1995) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Preemption cannot occur absent "the clear and manifest purpose of Congress," the best evidence of which is found in the plain text of the statute. *Id.* Thus the court must "focus on the plain wording. . . . which necessarily contains the best evidence of Congress' preemptive intent." *Travel All Over the World*, 73 F.3d at 1430 (quoting *CSX Transp.*, 507 U.S. at 664). Accordingly, the court begins by looking at the text of the CISG.

Article 4 of the CISG states that the CISG:

governs *only* the formation of the contract of sale and the rights and obligations *of the seller and the buyer* arising from such a contract. In particular, except as otherwise expressly provided in this Convention, it is not concerned with: (a) the validity of the contract or of any of its provisions or of any usage; (b) the effect which the contract may have on the property in the goods sold.

15 U.S.C.A. app. at 335-36 (emphasis added). The plain text of the CISG limits its application to claims between buyers and sellers. As the Usinor Defendants correctly note, Caterpillar did not directly buy Creusabro steel from anyone; Caterpillar bought completed truck bodies from CMSA and Westech. (Usinor Mem., at 9; Compl. ¶ 20.) CMSA, not Caterpillar, bought the steel from

Leeco, Usinor's agent. (Compl. ¶ 20.) As such, only CMSA can assert claims under the CISG, and it has (in Counts I and II). (*Id.* ¶¶ 36-41.)

In support of their respective positions, both sides cite to *Usinor Industeel*, 209 F. Supp. 2d 880, an action between two of the defendants in this case, Usinor and Leeco. *Usinor Industeel*, as it happens, involved shipments of the very Creusabro steel which Leeco bought from Usinor and intended to sell to Caterpillar. *Id.* at 882. Under the terms of the contract between Leeco and Usinor, Usinor remained the owner of the steel until Leeco paid Usinor in full, which Leeco was obligated to do within 60 days following receipt of the steel. *Id.* Leeco, however, bought the steel on a line of credit from LaSalle Bank, giving LaSalle a security interest in the steel. *Id.* at 888. After Caterpillar stopped using Creusabro, Leeco was left with a large amount of steel for which it owed Usinor nearly a million dollars. *Id.* at 882. Usinor filed a diversity action for replevin in federal court. *Id.* at 881.

LaSalle intervened, arguing that under the UCC, its security interest in the steel gave it superior title, thus precluding Usinor's ability to replevin the steel. *Id.* at 883. According to Usinor, however, any interest that LaSalle had in the steel could have arisen only from the contract between Leeco and Usinor, which Usinor claimed was governed by the CISG. *Id.* Usinor argued that the CISG preempted the UCC, thus voiding any interest LaSalle might have had under the UCC and allowing Usinor to replevin the steel. *Id.* The court disagreed with Usinor. While noting that the CISG would preempt the UCC if it applied, the court held that the CISG did not apply when a third party had an interest in the goods, and that the UCC should govern. *Id.* at 885-86. Under the UCC, Usinor had merely an unperfected reservation of a security interest in the steel, which was inferior to LaSalle's interest and, thus, insufficient to maintain an action for replevin. *Id.* at 888.

In this case, the Usinor Defendants argue that the holding of *Usinor Industeel* should be limited to situations where the third party's interest is in *title* to the goods, thus preserving a broader concept of preemption. (Usinor Reply, at 2.) As this court reads that decision, however, it suggests

a narrower interpretation of the CISG's preemptive force. Noting Article 4's limitation of the application of the CISG to the rights and obligations of the buyer and the seller, the *Usinor Industeel* court quoted commentators who suggested that the CISG simply does not apply to third parties who are not parties to the contract. 209 F. Supp. 2d at 885 (quoting Richard Speidel, *The Revision of UCC Article 2, Sales in Light of the United Nations Convention on Contracts for the International Sale of Goods*, 16 Nw. J. INT'L L. & BUS. 165, 173 (1995) ("CISG is not concerned with . . . the rights of third persons who are not parties to the contract . . . CISG is limited to two-party commercial contracts for sale . . . .")); *See* John Honnold, *Uniform Law for International Sales* § 444.1 (3d Ed. 1999) ("[T]he [CISG's] rules are limited to the rights 'of the seller and the buyer' and yield to the rights of third persons such as creditors *and purchasers*.") (emphasis added).

The Usinor Defendants cite several district court decisions which have held that the CISG preempts UCC claims. (Usinor Mem., at 7.) All, however, involve actions between parties to the contract. *See, e.g., Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, No. 01 C 4447, 2003 WL 21254261, at *3 (N.D. Ill. May 29, 2003) (holding that the CISG governed contract between U.S. seller of pork ribs and Canadian buyer); *Geneva Pharmaceuticals Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236 (S.D.N.Y. 2002) (finding preemption by the CISG of state law contract claims), *aff'd in part, rev'd in part on other grounds*, 386 F.3d 485 (2d Cir. 2004); *Asante Techs.*, 164 F. Supp. 2d at 1152.

The Usinor Defendants rely heavily on the last of these cases, *Asante Technologies*, in which Asante Technologies, a U.S. manufacturer of network switches, bought integrated circuits for use in its switches from PMC-Sierra, a Canadian seller. 164 F. Supp. 2d at 1144-45. Of five purchase orders, Asante issued four to PMC-Sierra's U.S. distributor, but issued one directly to PMC-Sierra. *Id.* at 1145. When the integrated circuits failed to meet specifications, Asante sued for breach of contract and breach of implied warranty in California state court. *Id.* at 1144-45. PMC

removed to federal court, claiming CISG preemption, and Asante moved to remand. *Id.* at 1144. The court held that the CISG preempted the state law UCC claims. *Id.* at 1152.

Asante Technologies is distinguishable from the present case. There, at least one purchase order was issued directly from the American buyer to the Canadian seller. Here, in contrast, Caterpillar, the U.S. buyer, issued purchase orders to CMSA, its Mexican subsidiary, which then issued purchase orders to Leeco, Usinor's U.S. agent. (Compl. ¶ 20.) Thus, Caterpillar's position is twice removed compared to the plaintiff in *Asante Technologies*. The Usinor Defendants have failed to cite to any authority in support of the notion that the CISG preempts a UCC claim brought by a party not in privity to the contract. In fact, Defendants admit in their brief that the CISG limits recovery to those in privity of contract. (Usinor Mem., at 8.) Accordingly, the court finds that Caterpillar's state law UCC claim (Count V) is not preempted by the CISG.

Defendants also argue that the CISG preempts Plaintiffs' promissory estoppel claims (Count III, by CMSA, and Count VIII, by Caterpillar). (Usinor Mem., at 7-8.) They cite no authority in support of this position, however; the above cases involved only UCC claims. In fact, the court can find no reported decision which holds that the CISG preempts promissory estoppel claims. *See* Lauzon, Annotation, *supra*, § 2(a) (the CISG "does not apply to promissory estoppel claims"). *Geneva Pharmaceuticals*, cited by Defendants, held that the CISG did *not* preempt the plaintiff's promissory estoppel claim because the CISG appeared to utilize a "modified" version of American promissory estoppel which did not require foreseeability or detrimental reliance. 201 F. Supp. 2d at 287.[17] In light of the need for reluctance in finding preemption in areas traditionally governed by

---

[17]     Defendants rely heavily on the court's suggestion in *Geneva Pharmaceuticals* that some promissory estoppel claims might be preempted if the plaintiff were bringing the state law claim in an attempt to circumvent the CISG's "firm offer" requirement for the formation of a contract. 201 F. Supp. 2d at 287. Not only is this mere *dicta* in a district court decision from another jurisdiction, but such a situation does not exist here. As noted above, the CISG cannot apply to any of Caterpillar's claims because it is not a party to the contract, and since CMSA issued purchase orders to Leeco, no one is disputing the existence of a contract containing a "firm offer" between
(continued...)

state law, see *Time Warner Cable*, 66 F.3d at 874-75, the court declines to extend the preemptive force of the CISG to state law claims for promissory estoppel.

In sum, the court finds that the CISG does not preempt Count V, Caterpillar's UCC claim against Usinor, because Caterpillar is not a party to the contract. Nor does the CISG preempt Counts III or VIII, Plaintiffs' promissory estoppel claims against Usinor. Accordingly, the court will determine the validity of those claims under Illinois law; the CISG will govern only Counts I and II.

## V. The CISG Claim (Count II)

CMSA brings Count II against Usinor under the CISG for breach of express and implied warranties, including an implied warranty of fitness for a particular purpose and failure to deliver conforming goods.[18] (Compl. ¶ 46.) CMSA alleges that the purchase orders issued by CMSA to Leeco specified that the CISG would govern terms and conditions, (*id.* ¶ 37), and that Usinor is liable on the purchase orders as Leeco's principal. (*Id.* ¶ 43.) Usinor argues that Leeco was not its agent, and that, as CMSA issued purchase orders only to Leeco and not to Usinor, there was no privity between CMSA and Usinor. (Usinor Mem., at 8-9, 11-12.)

This argument need not detain the court. As noted above, Plaintiffs have adequately alleged that Leeco was Usinor's agent. Under agency law, a disclosed principal is a party to a contract made by the principal's agent if the agent acted within its authority. RESTATEMENT (SECOND) OF AGENCY § 147. Usinor is therefore alleged to be a party to the purchase orders issued by CMSA to Leeco, and Count II cannot be dismissed for lack of privity.

As for the substantive allegations, Article 35 of the CISG provides that the seller must deliver goods which are of the quality and description required by the contract; the goods do not

---

(...continued)
CMSA and Leeco.

[18]    CMSA does not identify which part of the CISG forms the basis of its claim. The court notes that Articles 35 and 36 concern the sale of nonconforming goods. 15 U.S.C.A. app. at 342-43.

conform with the contract unless they possess the qualities of goods held out to the buyer as a sample. 15 U.S.C.A. app. at 342. Article 36 establishes the seller's liability for any lack of conformity. *Id.* at 343. CMSA has asserted that Usinor did not provide goods of the quality and description required by the purchase orders, and has detailed numerous problems with the Creusabro steel, including hydrogen-induced cracking and other quality issues. (Compl. ¶¶ 22-33, 44.) CMSA has also asserted that the steel did not possess the qualities held out by Usinor as a sample. (*Id.* ¶ 45.) CMSA has thus sufficiently stated a claim under the CISG.

## VI. The UCC Claim (Count V)

Caterpillar brings Count V against Usinor for breach of express and implied warranties under Illinois's codification of the UCC, 810 ILCS 5/2-313 and 810 ILCS 5/2-315. (Compl. ¶¶ 60-66.) Caterpillar alleges that Usinor, through its agents Leeco and Usinor USA, made numerous unambiguous promises about Creusabro steel (*id.* ¶ 61); that these promises were in writing, including in brochures and marketing materials (*id.*); that these promises were breached when the steel did not perform as promised (*id.* ¶ 62); that the steel did not possess the qualities of goods held out as a sample (*id.* ¶ 63); that Usinor knew that the steel was being purchased for a particular purpose (*id.* ¶ 64); and that Usinor knew that Caterpillar was relying on Usinor's skill and judgment in selecting and furnishing the steel. (*Id.*)

Usinor argues that both the express and implied warranty claims fail for lack of vertical privity. (Usinor Mem., at 9-10.) Usinor notes that Caterpillar only bought truck bodies from CMSA, and never directly bought Creusabro steel from anyone. (*Id.*) Usinor further argues that even if the required privity were present, Caterpillar cannot state a claim for breach of implied warranty under 810 ILCS 5/2-315 because Caterpillar has not shown that it relied on Usinor's skill and judgment. (*Id.* at 10-11.)

23

## A. Breach of Express Warranty

To state a claim for breach of express warranty in Illinois, a plaintiff must show a breach of an affirmation of fact or promise that was made a part of the basis of the bargain. 810 ILCS 5/2-313; *Hasek v. DaimlerChrysler Corp.*, 319 Ill. App. 3d 780, 788, 745 N.E.2d 627, 634 (1st Dist. 2001). The seller may be liable if the goods sold fail to conform to the affirmations, promises, or descriptions of the goods. *Weng v. Allison*, 287 Ill. App. 3d 535, 537, 678 N.E.2d 1254, 1256 (3d Dist. 1997). A sample of the goods which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample. 810 ILCS 5/2-313. To enforce an express warranty under Illinois law, however, a party without a warranty assignment alleging purely economic loss must be in privity of contract. *Collins Co. v. Carboline Co.*, 837 F.2d 299, 301 (7th Cir. 1988) (certifying to the Illinois Supreme Court the question of whether a valid warranty assignment creates privity). "Privity requires that the party suing has some contractual relationship with the one sued." *Crest Container Corp. v. R.H. Bishop Co.*, 111 Ill. App. 3d 1068, 1076, 445 N.E.2d 19, 25 (5th Dist. 1982). Only a valid assignment of the express warranty creates privity of contract. *Collins Co. v. Carboline Co.*, 864 F.2d 560, 561 (7th Cir. 1989) (conforming to the Illinois Supreme Court's affirmative answer to the certified question whether a warranty assignment creates privity).

Here, Caterpillar was not in privity of contract with Usinor. Caterpillar issued purchase orders to CMSA for truck bodies; it was CMSA who bought the steel from Leeco, Usinor's agent. (Compl. ¶ 20.) Caterpillar may have established the existence of an express warranty by alleging that Usinor made numerous promises regarding the performance of the Creusabro steel (*id.* ¶ 61); that the steel failed to conform to those promises (*id.* ¶ 62); and that the steel failed to measure up to the sample. (*Id.* ¶ 63.) Only CMSA was in privity with Usinor, however, and Plaintiffs have made no assertion that CMSA assigned warranty rights to Caterpillar. Thus, Caterpillar cannot enforce the express warranty and its claim of breach against Usinor cannot be sustained.

24

## B.    Breach of Implied Warranty

To state a claim for breach of implied warranty, a plaintiff must show that before the sale, the seller had reason to know the particular purpose for which the plaintiff bought the goods; that the plaintiff was relying on the seller's skill or judgment to select goods suitable for that purpose; and that the goods were not suitable for that particular purpose. 810 ILCS 5/2-315; *Rubin v. Marshall Field & Co.*, 232 Ill. App. 3d 522, 526-27, 597 N.E.2d 688, 691 (1st Dist. 1992). Once again, however, "privity of contract is a prerequisite to recover economic damages for breach of implied warranty" under Illinois law. *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 525 (7th Cir. 2003) (citing *Rothe v. Maloney Cadillac, Inc.*, 119 Ill. 2d 288, 292, 518 N.E.2d 1028, 1029-30 (1988); *Larry J. Soldinger Assocs., Ltd. v. Aston Martin Lagonda of N. Am., Inc.*, No. 97 C 7792,1999 WL 756174, at *10 (N.D. Ill. Sept. 13, 1999). At least with respect to purely economic loss, implied warranties "give a buyer of goods a potential cause of action only against his immediate seller." *Rothe*, 119 Ill. 2d at 292, 518 N.E.2d at 1029.

As noted above, Caterpillar was not in privity of contract with Usinor.    Caterpillar nonetheless argues that an exception to the vertical privity rule exists in Illinois. (Pl. Resp., at 11-12). Caterpillar cites to a line of cases which held that privity is not required where a manufacturer knows the identity, purpose, and requirements of its distributor's customer and manufactures goods specifically to meet those requirements. *See, e.g., Chrysler Corp. v. Haden Uniking Corp.*, No. 91 C 20326, 1992 WL 373039, at *9 (N.D. Ill. Dec. 3, 1992) (no privity required where manufacturer of conveyer system who was not a party to the contract designed, manufactured, and installed the buyer's conveyor system specifically for the buyer); *Abco Metals Corp. v. J.W. Imports Co.*, 560 F. Supp. 125, 128 (N.D. Ill. 1982) (no privity required when buyer of wire chopper had "direct relationship" with manufacturer, even though the plaintiff had bought the machine from a distributor); *Crest Container*, 111 Ill. App. 3d at 1076, 445 N.E.2d at 25 (no privity required where manufacturer of heating coil units selected coil based on specifications provided by the plaintiff's

25

subcontractor and custom made the coils for the plaintiff's heating system). Caterpillar argues that the exception applies here because Caterpillar gave Usinor specifications for its truck bodies, and because Usinor was well aware of Caterpillar's uses and requirements for the Creusabro steel. (Pl. Resp., at 11-12.) The court disagrees.

To begin with, it is far from certain that Illinois permits *any* exception to the vertical privity requirement for breach of implied warranty in light of the decisions of the Illinois Supreme Court in *Rothe*, 119 Ill. 2d 288, 518 N.E.2d 1028, and *Szajna v. General Motors Corp.*, 115 Ill. 2d 294, 503 N.E.2d 760 (1986). *See Forbes, Inc. v. Reliance Indus. Elec. Co.*, No. 95 C 4891, 1996 WL 650614, at *2 (N.D. Ill. Nov. 7, 1996) (noting the doubtful precedential value of pre-1986 cases which utilized exceptions to the vertical privity rule). In *Szajna*, the court, making no mention of any exceptions, expressly rejected the abolition of the vertical privity requirement for breach of implied warranty in cases of economic loss. 115 Ill. 2d at 310, 503 N.E.2d at 767. The court declined to engage in the type of "judicial legislation" that any extension of the coverage of implied warranties would necessarily entail. *Id.*; *see Rothe*, 119 Ill. 2d at 292, 518 N.E.2d at 1029-30 (explaining and reiterating *Szajna*'s holding).

Of the three cases cited by Caterpillar, two—*Abco Metals* and *Crest Container*—were decided before *Szajna* and are thus called into doubt. In the third case, *Haden Uniking*, decided in 1992, the court noted *Szajna*'s forceful statement of the vertical privity rule and based its holding not on the exception urged here by Caterpillar, but on the theory that the buyer was a third-party beneficiary to the contract. 1992 WL 373039, at *9.[19] Caterpillar has thus failed to cite any post-

---

[19]     Plaintiffs have not argued that Caterpillar was a third-party beneficiary to the contract between CMSA and Leeco, and the court has doubts concerning the merits of such an argument. In Illinois, a third party cannot sue on a contract under a beneficiary theory unless the contract itself affirmatively makes clear that the contract was entered into for the third party's direct benefit. *E.B. Harper & Co. v. Nortek, Inc.*, 104 F.3d 913, 921 n.4 (7th Cir. 1997) (citing *Barney v. Unity Paving, Inc.*, 266 Ill. App. 3d 13, 19, 639 N.E.2d 592, 596 (1st Dist. 1994)). Such intent, if not explicit on the face of the contract, must be "practically an express declaration." *Id.* (internal quotations
(continued...)

*Szajna* authority to directly support the notion that an exception to the vertical privity rule exists when the manufacturer designs or manufactures goods specifically for a party not in privity.

Even if the exception still exists in Illinois, the cases cited by Caterpillar are distinguishable. In *Haden Uniking*, the defendant designed, built, and installed a conveyor system specifically for Chrysler's factory; it was custom made. 1992 WL 373039, at *9. The defendant in *Abco Metals* built the wire chopper to meet the plaintiff's precise specifications. 560 F. Supp. at 127. The heating coils in *Crest Container*, moreover, were "custom made" to specifications supplied by the plaintiff's subcontractor. 111 Ill. App. 3d at 1076, 445 N.E.2d at 25. Here, in contrast, the Complaint is devoid of any allegation that Usinor "custom made" Creusabro steel specifically for Caterpillar. The common thread in the above cases is that the buyer told the manufacturer of its needs *before* the product was built. Here it was the other way around: Caterpillar told Usinor what it needed *after* Usinor told Caterpillar about the properties of the Creusabro steel in the 1998 and 2000 sales presentations. (Compl. ¶¶ 13, 15, 16). Caterpillar did not give specifications for truck bodies to Usinor until *after* it had tested Creusabro and found it satisfactory. (*Id.* ¶ 14.) Moreover, Caterpillar does not allege that after it gave Usinor the specifications, Usinor specifically designed the Creusabro that it sold to CMSA and Westech for use in the truck bodies. Unlike the custom designed, finished products and systems in the above cases, Usinor appears to have provided a mere component to CMSA and Westech; it was CMSA and Westech who designed a finished product for Caterpillar, not Usinor. (*Id.* ¶ 17.)

Caterpillar's claim for breach of implied warranty thus fails for lack of privity. Having reached this conclusion, the court need not address Defendants' argument that Caterpillar has not

---

(...continued)
omitted). Plaintiffs have not alleged that the purchase orders sent by CMSA to Leeco contain any such declaration.

shown the requisite reliance. The Usinor Defendants' motion to dismiss Count V for failure to state a claim is granted.

## VII.    Promissory Estoppel (Counts III and VIII)

CMSA brings Count III, and Caterpillar brings Count VIII, against Usinor for promissory estoppel. (Compl. ¶¶ 48-53, 83-88.) To state a claim for promissory estoppel in Illinois, a plaintiff must allege: (1) an unambiguous promise; (2) reasonable and justifiable reliance by the party to whom the promise was made; (3) the reliance was expected and foreseeable by the promissor; and (4) the promissee relied upon the promise to her detriment. *Fischer v. First Chicago Capital Markets, Inc.*, 195 F.3d 279, 283 (7th Cir. 1999). Plaintiffs allege that Usinor, through its agents Usinor USA and Leeco, made clear and definite oral and written promises about Creusabro steel that Plaintiffs relied upon to their detriment, and that such reliance was reasonable and foreseeable to Usinor. Usinor argues that Plaintiffs have not established the necessary elements of a promissory estoppel claim because they fail to allege either a promise or reasonable reliance. (Usinor Mem., at 12-13.) Usinor further argues that the claims are barred by the statute of frauds because the alleged promises were not made in any signed writings. (*d.* at 13-14.)

### A.    The Alleged Promises

Plaintiffs contend that Usinor made several clear promises in this case: that the Creusabro steel was harder, had a higher yield strength, and could be processed more cheaply than regular steel (Compl. ¶ 13); that Creusabro did not require preheating for joints less than 50 mm thick (*id.* ¶¶ 13, 15); that all the Creusabro would perform as well as the sample (*id.* ¶ 14); and that CMSA's and Westech's facilities were appropriate for making truck bodies with Creusabro.[20] (*Id.* ¶ 19).

---

[20]    The Usinor Defendants contend that the promise regarding the facilities was made only to CMSA, and that Caterpillar cannot sustain a promissory estoppel claim as a third-party beneficiary to that promise. (Usinor Mem., at 13.) This is incorrect; the Complaint states that "Usinor, Usinor USA and Leeco informed *Caterpillar* that the facilities and processes in place at CMSA and Westech were appropriate...." (Compl. ¶ 19.) (emphasis added).

Usinor argues that these were mere descriptions of the qualities of Creusabro or opinions of the facilities at CMSA and Westech, none of which constitutes a "promise." (UsinorMem., at 12-13.)

Promissory estoppel is usually based on a promise of future action, not a representation of fact. *See Guaranty Residential Lending*, 305 F. Supp. 2d at 866 (statement to secondary mortgage buyer that the value of properties was the true market value constituted a mere representation of fact and was not a "promise" for purposes of stating a promissory estoppel claim); *Promero, Inc. v. Mammen*, No. 02 C 1191, 2002 WL 31455970, at *9 n.2 (N.D. Ill. Nov. 1, 2002) (noting that while equitable estoppel involves misrepresentations of fact, "promissory estoppel involves promises of future action"). A promise for purposes of promissory estoppel typically involves "a declaration that one will do or refrain from doing something specified." *Derby Meadows Utility Co. v. Inter-Continental Real Estate*, 202 Ill. App. 3d 345, 361, 559 N.E.2d 986, 995 (1st Dist. 1990) (quoting WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1851 (1986)). A statement that refers to "a past or existing condition rather than committing to some future action is thus more precisely described as a warranty than as a promise." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. d (1981) (remaining citations omitted)).

As Usinor urges, none of the statements referred to by Plaintiffs as "promises" constitute a declaration that Usinor or its agents will do or refrain from doing any future action. They are, instead, arguably mere representations of fact and opinion regarding the inherent qualities and likely performance of Creusabro steel, as well as the appropriateness of CMSA's facilities for fabricating truck bodies with that steel. The court is not persuaded, however, that a seller's representations regarding the qualities of goods can *never* constitute a promise in the context of a promissory estoppel claim. In *All-Tech Telecom*, a case cited by neither party here, the Seventh Circuit allowed for the possibility that a promise that warrants an existing condition can, in some circumstances, be the basis for a promissory estoppel claim. 174 F.3d at 869. In that case, Amway

offered to its distributors a credit-card-operated telephone system called TeleCharge for sale to restaurants and hotels. *Id.* at 864. All-Tech, an Amway distributor that was formed for the sole purpose of distributing the TeleCharge system, bought a large number of the phones. Amway told All-Tech that Amway had thoroughly researched the phone program before offering it. When TeleCharge proved "a flop," Amway withdrew it. *Id.*

All-Tech brought several claims against Amway, including one for promissory estoppel over Amway's "promise" of having done thorough research. *Id.* at 868. The court, applying Wisconsin law in an opinion written by Judge Posner, found that Amway's "promise" was more like a warranty, but that inherent in such a warranty was a promise to pay for the consequences of breaching that warranty. *Id.* at 868-69. As such, a breach of a "warranty" based on a promise regarding an existing condition could be the basis of a promissory estoppel claim. *Id.* at 869. The plaintiff's promissory estoppel claim nonetheless failed in *All-Tech Telecom* because such a claim may not function as an "end run" around the parol evidence rule, or around the rule that puffery is not actionable. *Id.* Nor should a court allow a promissory estoppel claim if the promise emerged from an express contract governing the relationship of the parties, such as the contract that existed between All-Tech and Amway. *Id.*

In *All-Tech Telecom*, Judge Posner wrote that "promissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law." *Id.* Such is the situation here. As discussed above, Caterpillar's claims for breach of express and implied warranties failed due to a lack of vertical privity with Usinor. Unlike the parties in *All-Tech Telecom*, none of Usinor's representations regarding Creusabro steel emerged from any contract between Caterpillar and Usinor. Nor were Usinor's promises mere "puffery." Indeed, Usinor made fact-specific and highly technical promises, such as that Creusabro could be welded without preheating for joints up to 50 mm thick, and that any of four industry-accepted welding processes could be used. (Compl. ¶¶ 13, 15, 31.) Usinor's representations of

opinion and fact regarding Creusabro essentially constitute a warranty, the breach of which Caterpillar cannot allege because of the vertical privity rule. Accordingly, the court finds that Usinor's representations regarding the properties and performance of Creusabro, the promise that the steel would perform like the sample, and the statements regarding the appropriateness of CMSA's facilities for using the steel, constitute promises for purposes of Caterpillar's promissory estoppel claim (Count VIII).

In contrast, CMSA's relationship with Usinor is governed by an express contract – the purchase orders issued to Leeco. (Compl. ¶ 20.) CMSA could use Usinor's promises to establish a claim for breach of warranty under that contract and, in fact, CMSA has alleged precisely that claim under the CISG in Count II. (*Id.* ¶¶ 42-47.) There is no reason to allow CMSA to proceed with a state law claim for promissory estoppel that essentially duplicates its breach of warranty claim under the CISG. "Promissory estoppel is not a doctrine designed to give a party ... a second bite at the apple in the event it fails to prove a breach of contract." *All-Tech Telecom*, 174 F.3d at 869-70 (quoting *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984)). The court thus grants the Usinor Defendants' motion to dismiss Count III for failure to state a claim.

### B.     Caterpillar's Reliance

Even if Usinor's representations constitute a promise for purposes of Caterpillar's promissory estoppel claim (Count VIII), Usinor further argues that Plaintiffs have not alleged the requisite reliance. (Usinor Mem., at 13.) To state a claim for promissory estoppel, a plaintiff must allege that it reasonably and justifiably relied on the defendant's promise. *See Fischer*, 195 F.3d at 283 (finding that the administrator of a bond program satisfied the reliance requirement by alleging that he continued to administer the bond program that he implemented, after his hourly pay had ceased, because of a promise that he would receive an annual fee based on the value of the bonds). Usinor contends that Caterpillar could not have reasonably relied on Usinor's

representations because Caterpillar obtained and tested a sample of Creusabro long before even informing Usinor of its proposed use. (Usinor Mem., at 13.)

Usinor's argument fails because Caterpillar has alleged promises that have nothing to do with Caterpillar's testing of the sample. For instance, Caterpillar alleges that Usinor promised that the sample of Creusabro was representative of the steel that Usinor would provide, and that all the Creusabro would perform as well as the sample. (Compl. ¶ 14.) Indeed, the first shipment of Creusabro showed no problems (*id.* ¶ 21); the problems began with the second shipment. (*Id.* ¶ 22.) After the problems developed, chemical analysis from CMSA and Westech showed that the later shipments of Creusabro steel failed to comply with the chemical specifications originally provided; the later shipments of steel were not of the same quality as the sample. (*Id.* ¶ 33.) Thus, while Caterpillar, by testing the sample, had initially and partially relied on its own expertise in selecting Creusabro, it was further relying on Usinor's promise to provide steel which would perform as well as that sample.

Caterpillar has also alleged that it relied on Usinor's promise that the facilities at CMSA and Westech were appropriate for fabricating truck bodies using Creusabro steel. (*Id.* ¶ 19.) This promise, too, has nothing to do with Caterpillar's testing of the sample. Indeed, the mere fact that Caterpillar tested the sample does not serve to absolve Usinor of responsibility for the variety of promises and representations that Caterpillar has alleged Usinor made. In fact, Usinor has cited no authority in support of the notion that a buyer's testing of a sample provides such blanket immunity to the seller.[21]   Finally, Caterpillar has alleged that it relied on *all* of Usinor's

---

[21]   The Usinor Defendants, while arguing for dismissal of the UCC claims, cite *Trans-Aire Int'l, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1258 (7th Cir. 1989) in support of their position that Caterpillar's testing of the sample prevents Caterpillar from showing the requisite reliance for a claim of breach of implied warranty. (Usinor Reply, at 9.) In *Trans-Aire Int'l*, the plaintiff, a company that converted vans into recreational vehicles, purchased an adhesive from the defendant that failed to perform in the summer months. 882 F.2d at 1256. The plaintiff had tested the adhesive in cooler conditions, which the court found sufficient to support summary judgment (continued...)

representations, not just those it could have verified by testing the sample, in submitting proposals for lighter-weight truck bodies to its customers. (*Id.* ¶ 17.) Caterpillar has sufficiently alleged reliance on Usinor's promises, and has thus stated a claim for promissory estoppel.

### C. The Statute of Frauds

Usinor's final argument for dismissal of Caterpillar's promissory estoppel claim is that it is barred by the statute of frauds. (Usinor Mem., at 13-14.) Under the UCC's statute of frauds, a signed writing is required to enforce a contract for the sale of goods for more than $500. 810 ILCS 5/2-201(1). In Illinois, "the statute of frauds is applicable to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel." *Fischer*, 195 F.3d at 284. Usinor argues that to state a claim of promissory estoppel, the statute of frauds requires that the alleged promise be contained in a signed writing, and that Caterpillar's claim fails because it has not alleged the existence of any writing signed by Usinor. (Usinor Reply, at 11.)

Usinor's argument is without merit. To begin with, Caterpillar has alleged numerous written promises. For instance, Caterpillar alleges that Usinor "again promised Caterpillar, both orally and in writing that the new steel could be welded without preheating up to 50 mm." (Compl. ¶ 15.) Caterpillar also alleges that it relied "upon the oral and written representations from Usinor'when it submitted the proposals for lighter-weight truck bodies to its customers, and that it decided to use Creusabro "[i]n reliance on these promises and others made by defendants in meetings, presentations, and written communications . . . ." (*d.* ¶¶ 1, 17.)

---

(...continued)
against the plaintiff for waiving reliance on the implied warranties. *Id.* at 1258-59. That case is inapposite in several respects: first, it did not involve a claim for promissory estoppel; second, the buyer had not alleged, as Caterpillar has here, other promises having nothing to do with the testing, such as that the goods would conform to the sample; and third, the court affirmed a summary judgment, not a motion to dismiss, and thus was able to rely on other facts besides the mere activity of testing to support its holding that the plaintiff had waived reliance.

Usinor argues that these writings are insufficient to escape the statute of frauds because none of these alleged promises was signed by Usinor. (Usinor Reply, at 11.) Usinor misstates the law; Caterpillar is not required to allege that the writings were signed for purposes of a promissory estoppel claim. The text of the statute of frauds bars enforcement of a "*contract for the sale of goods*" absent "some writing sufficient to indicate that a *contract for sale* has been made between the parties and signed." 810 ILCS 5/2-201(1) (emphasis added). By its very text, the statute requires a signed writing only in cases involving contracts. In *Fischer*, the Seventh Circuit noted that the statute of frauds can apply to promissory estoppel claims, but the court did *not* hold that such application required that a promise be in writing and signed. 195 F.3d at 284. The court held that the statute of frauds barred the plaintiff's claim on entirely different grounds – i.e., that the promise could not be performed within a year. *Id.* In fact, Usinor has cited no authority in support of the notion that promises have to be signed to state a promissory estoppel claim.

The only other case Usinor cites is *Perminas v. Novartis Seeds, Inc.*, No. 00 C 4581, 2000 WL 1780249, at *3-4 (N.D. Ill. Dec. 4, 2000), which is inapposite. In *Perminas*, the issue was the enforcement of an oral contract, and the court held that if an oral contract is barred by the statute of frauds, a plaintiff cannot claim promissory estoppel as a way of "doing an end-run" around the fact that the oral contract failed. Here, by contrast, there is no contract, oral or otherwise, between Caterpillar and Usinor that would be otherwise barred by the statute of frauds.

Caterpillar has alleged the existence of writings containing promises upon which it relied. Usinor does not dispute the existence of these writings, but merely insists that Caterpillar should have alleged that the writings were signed. (Usinor Reply, at 11.) Requiring such a technicality would not be in keeping with a notice-pleading regime, in which "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome . . . ." *Swierkiewicz*, 534 U.S. at 514 (quoting *Conley*, 355 U.S. at 48). Moreover, since the court must draw all inferences in Plaintiffs' favor, the court easily infers that the writings were

34

indeed signed or otherwise identified as having been issued by Usinor. Even if such signatures are required (they are not), Caterpillar's allegations would be sufficient to avoid application of the statute of frauds. *See Verotix Sys., Inc. v. Ann Taylor, Inc.*, No. 02 C 8639, 2003 WL 22682348, at *6 (N.D. Ill. Nov. 13, 2003) (holding that a plaintiff pleading promissory estoppel "is not required to allege every fact necessary in support of its claim and all inferences are to be drawn in its favor"). The court thus grants the Usinor Defendants' motion to dismiss CMSA's promissory estoppel claim (Count III), but denies the motion to dismiss Caterpillar's claim (Count VIII).

## VIII. Leeco's Motion to Dismiss Count VI

Leeco moves to dismiss Count VI pursuant to the Illinois "Distributor Statute," 735 ILCS 5/2-621, which provides that a non-manufacturing defendant in a product liability case may be dismissed if the defendant had nothing to do with the product's alleged defect. (Leeco Motion, at 2). *See also Ungaro v. Rosalco, Inc.*, 948 F. Supp. 783, 785 (N.D. Ill. 1996). As discussed above, Count VI against Leeco – a claim asserted by Caterpillar for breach of express and implied warranties under the UCC – is dismissed because Plaintiffs have adequately alleged that Leeco was Usinor's agent, and an agent cannot be liable on a contract made on behalf of a principal. Moreover, the same lack of vertical privity which prevented Caterpillar from stating a UCC claim against Usinor would similarly bar Caterpillar's UCC claim against Leeco. The court nevertheless addresses Leeco's argument in an effort to bring some clarity to the interpretation of this statute in federal court.

Under the Illinois "Distributor Statute," a non-manufacturing defendant in a product liability case, such as a distributor or retailer, may be dismissed if the defendant did not create, contribute to, or know of the product's alleged defect. 735 ILCS 5/2-621; *Ungaro*, 948 F. Supp. at 785. Section 2-621 can be applied to litigation in federal courts because its application is outcome-determinative. *Ungaro*, 948 F. Supp. at 785. Leeco argues that Count VI should be dismissed pursuant to § 2-621 because Caterpillar has not alleged that Leeco had anything to do with the

design and manufacture of the Creusabro steel, or that Leeco had any knowledge of the alleged defect in the steel. (Leeco Motion, at 3.) Although Count VI is a claim for breach of express or implied warranty of merchantability (Compl. ¶ 73), Leeco argues that it is nonetheless a "product liability" claim within the meaning of § 2-621. (Leeco Motion, at 2.)

In 1995, the Illinois legislature amended § 2-621 in Public Act 97-7. 1995 Ill. Legis. Serv., P.A. 89-7 § 15 (West). Prior to 1995, the statute provided for dismissal of claims against non-manufacturing defendants in "any product liability action based in whole or in part on the doctrine of strict liability in tort." 735 ILCS 5/2-621 (pre-1995 version). Public Act 89-7 substituted "on any theory or doctrine" for "in whole or in part on the doctrine of strict liability in tort." 1995 Ill. Legis. Serv., P.A. 89-7 § 15. Applying the change, one district court in 1996 held that the statute could now be applied to shield distributors from liability in negligence actions as well as strict liability actions. *Ungaro*, 948 F. Supp. at 786 (motion to dismiss negligence count granted in favor of retailer of allegedly defective bed that injured a child; the court held that the 1995 amendment reflected a clear legislative intent to extend § 2-621 beyond strict liability actions).

In 1997, however, the Illinois Supreme Court in *Best v. Taylor Mach. Works*, 179 Ill. 2d 367, 689 N.E.2d 1057 (1997) struck down Public Act 89-7 as unconstitutional in its entirety; none of its provisions was deemed severable. *Id.* at 467, 689 N.E.2d at 1104. If an act is unconstitutional in its entirety, the state of the law is as if the act had never been passed. *In re G.O.*, 191 Ill. 2d 37, 43, 727 N.E.2d 1003, 1007 (2000). The law in force is the law as it was before the adoption of the unconstitutional amendment. *People v. Gersch*, 135 Ill. 2d 384, 390, 553 N.E.2d 281, 283 (1990). Consequently, the court must analyze Leeco's argument under the version of the Distributor Statute that existed prior to the 1995 amendment. *See Hurst v. Capital Cities Media, Inc.*, 323 Ill. App. 3d 812, 822, 754 N.E.2d 429, 438 (5th Dist. 2001) (applying the version of 735 ILCS 5/13-217 that existed before amendment by Public Act 89-7).

Since the pre-1995 version of § 2-621 applies only to actions based "in whole or in part on the doctrine of strict liability in tort," Count VI cannot be dismissed pursuant to this statute. Count VI is not a strict liability tort claim, but a claim for breach of express or implied warranty of merchantability under Illinois's codification of the UCC. *See* 810 ILCS 5/2-313; 810 ILCS 5/2-315. Breach of warranty of merchantability claims are contract actions, not tort claims, and are thus outside the scope of § 2-621. *Garcia v. Edgewater Hosp.*, 244 Ill. App. 3d 894, 902, 613 N.E.2d 1243, 1249-50 (1st Dist. 1993) (holding that the Distributor Statute did not allow dismissal of action based on implied warranty of merchantability).[22]

Leeco acknowledges that the 1995 amendment of § 2-621 was ruled unconstitutional and that only the pre-amendment version remains valid. (Leeco's Reply in Support of Motion to Dismiss Count VI, at 2.) Inexplicably, however, Leeco quotes the *amended* version's "based on any theory or doctrine" language in support of its argument that a claim for breach of express or implied warranty is the equivalent of a product liability action. (*Id.* at 2.) Any argument based on that language necessarily fails; once an amendment is ruled unconstitutional, it is as if it never existed. *See In re G.O.*, 191 Ill. 2d at 43, 727 N.E.2d at 1007. Leeco then cites *Ungaro*, 948 F. Supp. 783, and *Inman v. Daimler-Chrysler Corp.*, No. 00 C 0134, 2000 WL 283016 (N.D. Ill. Mar. 9, 2000) in support of an expanded application of § 2-621. Both cases are of questionable precedential value. *Ungaro* was decided in 1996, a year before the Illinois Supreme Court held that the amended

---

[22]     In *Harper-Wyman Co. v. Reptron Elecs., Inc.*, No. 95 C 2600, 1996 WL 417542, at *3 (N.D. Ill. July 23, 1996) (Gettleman, J.), a federal district court declined to follow *Garcia* because the "based on any theory or doctrine" language of the 1995 amendment appeared to allow § 2-621 to apply to contract actions as well as strict liability tort claims. As noted above, however, the 1995 amendment was ruled unconstitutional by the Illinois Supreme Court in 1997. *Taylor Mach. Works*, 179 Ill. 2d at 467, 689 N.E.2d 1104. Moreover, although the court was willing to consider that § 2-621 could apply to an action in contract, the court found that a breach of implied warranty was not a "product liability" claim as the term was defined by 735 ILCS 5/2-2101, because the product had caused no damage to property other than the product itself. *Harper-Wyman*, 1996 WL 417542, at *2-3. 735 ILCS 5/2-2101, which defined "product liability action," provides no assistance in interpreting § 2-621 because it was created by Public Act 98-7 and was thus also stricken as unconstitutional by the Illinois Supreme Court in *Taylor Mach. Works*.

version of the statute was unconstitutional. *See Taylor Mach. Works*, 179 Ill. 2d at 467, 689 N.E.2d at 1104. *Inman* was decided in 2000 but cited *Ungaro* and the amended version of § 2-621, perhaps failing to note that the amended version was no longer good law. *Inman*, 2000 WL 283016, at *5. Moreover, both cases are inapposite because they extended the application of § 2-621 only to *negligence* actions, not contract actions.[23] Neither case supports the argument that a contract action, such as a breach of express or implied warranty, constitutes a "product liability" action. In fact, Leeco cites no case with any such holding.

Because the constitutionally valid version of § 2-621 applies only to actions based on "strict liability in tort," and Count VI is an action grounded in contract, Count VI cannot be dismissed under 735 ILCS 5/2-621. As noted above, however, Leeco's motion to dismiss Count VI is granted without prejudice because Leeco was Usinor's agent and, thus, Leeco cannot be liable on a contract made on Usinor's behalf.

### CONCLUSION

For the foregoing reasons, the Usinor Defendants' motion to dismiss (Doc. No. 22-1) is granted as to Counts III, IV, V, VII, X, and XI, but denied as to Counts II and VIII. Leeco's motion to dismiss Count VI (Doc. No. 21-1) is granted, and the court further dismisses Count IX. Defendants are directed to answer the surviving counts on or before April 21, 2005. Status conference is set for May 2, 2005, at 9:30 a.m.

ENTER:

Dated: March 30, 2005

REBECCA R. PALLMEYER
United States District Judge

---

[23]     *Ungaro* involved a negligence claim against the retailer of an allegedly defective bed; the court dismissed the claim under § 2-621. 948 F. Supp. 783. In *Inman*, the court dismissed a negligence claim which the plaintiff brought against a car dealer who sold a car with an allegedly defective seat belt. 2000 WL 283016, at *1.